***********
Upon review of all of the competent evidence of record with references to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and of the subject matter.
3. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
4. An employer-employee relationship existed between plaintiff and defendant at all relevant times.
5. Defendant is self-insured and its claims are administered by Key Risk Management.
6. Based upon plaintiff's salary, his compensation rate is the maximum compensation rate for 1993 which is $442.00.
7. Plaintiff suffered an injury by accident on July 29, 1993 when he was exposed to chemicals, specifically "Scout X-tra" while performing his duties as a regional agronomist for defendant.
8. This claim was accepted as compensable by a Form 21 Agreement approved by the Industrial Commission on April 19, 1995.
9. Plaintiff returned to work for defendant following the incident. His disability due to his injuries began on January 3, 1994.
10. Plaintiff returned to work for defendant, but his compensation was reinstated effective February 16, 1995 by an Industrial Commission Form 26 approved by the Industrial Commission on April 19, 1995.
11. Plaintiff continues to receive weekly benefits in the amount of $442.00.
12. On April 25, 2000, Executive Secretary Tracey Weaver entered an Order allowing defendant to replace Eileen Wilson as the medical rehabilitation professional and ordering plaintiff to attend an independent medical evaluation as long as the physician accommodated plaintiff's condition. The Order stated that, "Dr. Lieberman shall remain plaintiff's primary treating physician."
13. Defendant did not appeal or request reconsideration of Executive Secretary Weaver's Order.
14. On December 21, 2000, plaintiff's counsel filed a Motion for Reimbursement of Travel, Lodging, and Medical Service Expenses. Within this Motion, plaintiff's counsel specifically requested the following:
(1) payment of all outstanding expenses demonstrated in plaintiff's Exhibit A totaling $454.15;
(2) payment of the amount of 10% penalty for any reimbursement requests paid more than 60 days after their original submission as shown in plaintiff's Exhibit A;
(3) a directive to Key Risk Management that any reimbursement requests be made within 30 days of the date of the request;
(4) a directive that Key Risk Management reimburse both plaintiff and his wife's hotel and meal expenses incurred for plaintiff's medical treatment.
15. In an Order dated April 17, 2001, Special Deputy Commissioner Gina Cammarano vacated her own March 20, 2001 Order in this matter advising that a telephonic informal hearing would be scheduled to clarify the issues in dispute. This hearing was subsequently held on April 23, 2001. Each party was provided an opportunity to argue their position during the informal hearing.
16. On May 9, 2001, Special Deputy Commissioner Cammarano entered an Order stating that plaintiff was entitled to full reimbursement for his and his wife's traveling and lodging expenses, as well as timely reimbursement of expenses. The Order dated May 9, 2001 directed defendant to do the following:
(1) pay all outstanding expenses as shown on plaintiff's Exhibit 5, index of medical bills and expenses, within 10 days from the date of the Order;
(2) pay a 10% penalty for any reimbursements paid more than 60 days after their original submission as shown by plaintiff's Exhibit 5, within 10 days from the date of the Order;
(3) pay any future reimbursement requests within 30 days of the date of the request;
(4) reimburse both plaintiff and his wife's motel, food, parking and cab expenses incurred for plaintiff's medical treatment;
(5) reimburse plaintiff directly for Dr. Lieberman's visits within 30 days of the reimbursement request;
(6) pay a 10% penalty on any total disability benefits which were paid more than 14 days after they became due, specifically to include late payment of November and December benefits;
(7) implement necessary procedures to ensure that plaintiff's benefits are properly mailed to the correct address on a weekly basis.
17. On May 24, 2001, defendant filed an Industrial Commission Form 33 Request for Hearing appealing the above Administrative Decision and also seeking to have Dr. Lieberman removed as treating physician in this matter.
18. The parties stipulated the following into the evidence of record at hearing before the Deputy Commissioner:
(a) All Industrial Commission Forms;
(b) A complete copy of plaintiff's Industrial Commission file;
(c) Plaintiff's responses to defendant's First Set of Pre-hearing Interrogatories;
(d) Plaintiff's responses to defendant's Supplemental Pre-hearing Interrogatories;
(e) Medical records from Dr. Lieberman dated September 2, 1993, March 30, 1995, and March 28, 2001;
(f) Medical records from Dr. Darcy dated September 2, 1993, March 30, 1995, and March 28, 2001;
(g) Medical records from Dr. Jastreboff;
(h) Medical records from Dr. Copeland;
(i) Medical records from Raleigh Ear, Nose Throat;
(j) Corvel reports from Ms. Cindy Boycher;
(k) Reports from Ms. Brenda Johnson, N.C. Industrial Commission Nurse;
(l) Additional medical records.
19. The following exhibits were entered into the evidence of record at the hearing before the Deputy Commissioner:
a. Plaintiff's Exhibit 1-May 3, 1996 memorandum from Geraldine Pearce;
b. Plaintiff's Exhibit 2-index of medical bills;
c. Plaintiff's Exhibit 3-January 10, 2001 letter from Dr. Lieberman;
d. Plaintiff's Exhibit 4-series of letters from plaintiff's attorney;
e. Plaintiff's Exhibit 5-check photocopy;
f. Plaintiff's Exhibit 6-safe housing data;
g. Plaintiff's Exhibit 7-sign;
h. Defendant's Exhibit 1-August 30, 1999 letter from Teresa Vogler;
i. Defendant's Exhibit 1a-September 17, 1999 letter from Teresa Vogler;
j. Defendant's Exhibit 2-copy of pay screens;
k. Defendant's Exhibit 3-printout of benefits paid
l. Defendant's Exhibit 4-October 9, 2001 letter from plaintiff's attorney;
m. Defendant's Exhibit 5-printout of bills paid;
n. Defendant's Exhibit 6-payment history.
20. The issues before the Commission are whether defendant has complied with Special Deputy Cammarano's Order dated May 9, 2001; whether Dr. Lieberman should continue as plaintiff's treating physician; whether Dr. Lieberman should directly bill defendant; whether plaintiff is entitled to reimbursement for expenses, past and future, incurred to secure safe housing; whether plaintiff is entitled to be reimbursed for his travel expenses to travel to see Dr. Lieberman; and whether plaintiff's wife should receive reimbursement for her travel expenses to accompany plaintiff to see Dr. Lieberman.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 51 years old at the time of the hearing before the Deputy Commissioner and was working for the Department of Agriculture as a regional agronomist on July 29, 1993. Plaintiff was a state employee for almost 20 years. As an agronomist, plaintiff worked with local farmers to share information on how to improve their crops. His territory covered a nine county region, and he provided farmers information on plant nutrition, soil conditions, and crop growth techniques. He also assisted farmers with soil testing.
2. On July 29, 2003, plaintiff was in a field with a farmer when a crop dusting plane flew over the field in which plaintiff was standing and sprayed "Scout X-tra" on the field.
3. Prior to his injury on the job, plaintiff was an active, healthy man. He was able to play softball, participate in his church activities three to four times a week, and engage in activities that exposed him to perfume, fragrances, and other chemicals. He did not have to restrict his activities and his exposure to those situations did not make him ill. Plaintiff had a sinus problem that was surgically corrected prior to his injury.
4. Plaintiff's accidental toxic exposure caused him to develop pyrethroid intoxication and associated chemical sensitivity. On April 19, 1995 the Industrial Commission approved an Award of benefits to plaintiff on an Industrial Commission Form 21 Agreement for "Multiple Chemical Sensitivity" and an Award on a Form 26 Agreement on the same date.
5. Plaintiff attempted to return to work after his initial injury. Plaintiff did not want to be taken out of work, but was instructed by his supervisors that they did not want him to continue in the regional agronomist position due to the possible re-exposure to chemicals. As such, plaintiff was taken out of work in January 1994.
6. Plaintiff was offered an opportunity to return to work for defendant in the Raleigh, North Carolina office. Plaintiff sold his home in Clinton and moved his family to the Raleigh area to accept the offered position. Plaintiff and wife along with their two teenage daughters moved in with plaintiff's in-laws.
7. Plaintiff was unable to continue his job in Raleigh due to a flare up of his condition caused by exposure to chemicals, fragrances, building supplies, and other irritants in the work place. Defendant agreed and placed plaintiff out of work on workers' compensation benefits on February 16, 1995.
8. Plaintiff asked defendant to return him to work. He asked that he be allowed to work at home. Defendant refused to allow him to work at home and indicated that the Department did not have any work available for him.
9. Plaintiff worked with his medical nurse case manager, Eileen Wilson, to identify suitable jobs. Several were considered, but none were suitable.
10. Plaintiff has multiple symptoms resulting from his toxic exposure. He has problems with his mucus membranes: itchy, scratchy, burning eyes; eye and nose irritation; nose swelling shut; difficulty breathing; poor night vision; dry mouth; eye twitch; and difficulty swallowing. Plaintiff has problems with his hearing, specifically tinnitus and hyperacutsis. He has problems with mental functioning: inability to concentrate, inability to handle stress, irritability, and fatigue. He has problems with muscular aches and pain, chest tightness, and headaches. These symptoms increase upon exposure to fragrances and other chemicals.
11. Plaintiff and his family work to avoid exposure to fragrances and other chemicals. Plaintiff's wife and daughters have changed their grooming habits to eliminate hair spray, finger nail polish, perfume, and other chemical based products. Plaintiff is safest when he is not in an enclosed space with limited airflow. Plaintiff walks in the park and tries to go outdoors to avoid enclosed spaces.
12. Plaintiff does engage in activities in the community such as attending church services approximately three times a month, going to the store to run errands, putting gas in the car, or dropping off the car for service. Plaintiff goes to restaurants and visits other family members in their homes. Although plaintiff does these activities, he testified he does them with great difficulty.
13. However, plaintiff is always vigilant and alert to conditions which may cause a flare up. He tries to go to restaurants at slow times or off-hours. He puts gasoline in the car when traffic is lighter and breezes will disburse the fumes. For new or unfamiliar places, his wife enters the building first to determine if any strong fragrances or cleaners were recently used. His wife assists him with driving any significant distance, as he will become extremely fatigued or may have an exposure to a road construction project or blowing chemicals from a field, which will act as an irritant. When traveling, plaintiff relies upon his wife to help him avoid exposure to cleaning chemicals, carpet fragrances, or new paint.
14. An investigation completed by defendant supports plaintiff's testimony concerning his vigilance of possible exposures. There was no evidence from defendant's investigation that plaintiff misrepresented his functional abilities.
15. Plaintiff's primary treating physician is Dr. Allen Lieberman in Charleston, South Carolina. Defendant approved treatment by Dr. Lieberman for plaintiff and did not request a change in treating physicians until May 2001. At that point, defendant had approved Dr. Lieberman's treatment of plaintiff for eight years. There is insufficient evidence of record to overrule the prior decision of the Commission approving Dr. Lieberman as plaintiff's treating physician. The Commission finds by the greater weight of the competent evidence that Dr. Lieberman is an appropriate treating physician for plaintiff's condition.
16. Dr. Lieberman is an expert in treating individuals with toxic exposure and environmental sensitivities. Dr. Lieberman's treatment has helped plaintiff control and reduce his flare-ups. Dr. Lieberman has helped counsel plaintiff through changes in his lifestyle to reduce exposures. Dr. Lieberman's treatment has helped plaintiff stabilize his symptoms.
17. During the majority of plaintiff's workers' compensation claim, benefits were administered directly by the Department of Agriculture. Plaintiff had established a system with the Department whereby he made payment directly to Dr. Lieberman at the time of each visit. Upon presentation of the bills and evaluation in accordance with the North Carolina Industrial Commission guidelines, defendant sent reimbursement for Dr. Lieberman's expenses and charges directly to plaintiff.
18. Defendant recognized plaintiff's need for assistance traveling to and from his doctor's appointments. Since 1993, defendant paid for and compensated plaintiff for both his and his wife's meals and hotel expenses for any doctor's appointments to which he has traveled.
19. In 1999, Key Risk Management took over the administration of workers' compensation claims for defendant. At that point, plaintiff started to experience delays in payment of reimbursement requests and shortages of reimbursement amounts.
20. At the request of defendant, plaintiff underwent evaluations by physicians at Duke University. Dr. Dennis Darcy evaluated plaintiff in 1993, 1995, and 2001. Dr. Patrick Logue completed neuropsychological testing in 1995.
21. On March 30, 1995, Dr. Darcy evaluated plaintiff at the request of defendant. His notes reflect that Dr. Darcy felt that plaintiff had an increasing intolerance to exposure to chemicals in both the indoor and outdoor environments and that plaintiff fit into the classification for multiple chemical sensitivity syndrome. Dr. Darcy believed that plaintiff was impaired. Dr. Darcy also observed that the medical work-up by Dr. Lieberman was well documented in the records.
22. Dr. Darcy agreed with Dr. Lieberman that returning plaintiff to work would be beneficial, but that a home environment would be best, given plaintiff's history. Dr. Darcy stated that "[t]he levels of exposure that can trigger individuals who suffer from MCS are by definition, low-dose non-toxic exposures which seem to trigger some type of symptom response."
23. Dr. Darcy recommended neuropsychological testing with Dr. Patrick Logue. Plaintiff underwent such testing in May 1995. Dr. Logue observed that plaintiff had a diagnosis of multiple chemical sensitivity syndrome. The results of Dr. Logue's examination showed that plaintiff had relatively selective losses in visual and auditory attention and in frontal executive functions. He related these changes specifically to plaintiff's exposure, stating, "{t]he primary objectives of the evaluation that was done on May 5, 1995 was to provide information regarding a broad range of both cognitive and affective changes that have been associated with toxin exposure and multiple chemical sensitivities."
24. Dr. Logue suggested treatment for plaintiff for depression, stress, and a sleep clinic evaluation. Defendant did not authorize any of Dr. Logue's treatment recommendations. Defendant directed the nurse case manager, Eileen Wilson, to close her file on March 15, 1995 and again on September 27, 1995.
25. In May 1995, Dr. Joseph Jan Creech concluded that plaintiff was disabled due to "extreme sensitivity to multiple allergens." A psychiatric evaluation by Dr. Stephen Levitt concluded that plaintiff did not have any significant psychiatric disorder and that "most of the problems in terms of occupational and personal adjustments are conscious decisions being made by this man in the face of multiple chemical sensitivity syndrome rather than a psychiatric disorder."
26. Plaintiff has suffered exacerbations of his conditions due to subsequent chemical exposures. However, no evidence was presented showing that those exposures were independent, intervening events. In fact, no evidence was shown that the exposures would have had any effect on plaintiff, but for the toxic exposure of July 29, 1993.
27. Dr. Lieberman issued a letter confirming, and the Full Commission finds as fact, that plaintiff required the assistance provided by his wife for attending medical visits and medical treatment.
28. Plaintiff's Exhibit Number 2 shows that multiple late or reduced payments were made by defendant Key Risk in reimbursing plaintiff's medical and travel expenses. The adjuster in charge of the file stated that she did not receive Dr. Lieberman's notes to support plaintiff's requests for reimbursement. Plaintiff testified that he mailed the physician's notes with his requests for reimbursement. Plaintiff also testified that he used to be able to call and talk to defendant about bills and reimbursement to make sure the Department had received all the information they needed, but since Key Risk has taken over, plaintiff has not been able to call and talk to Key Risk about problems with checks and reimbursements.
29. Defendant Key Risk has been sending payment to Dr. Lieberman, who in turn sends the reimbursement to plaintiff. This process creates a delay in plaintiff's reimbursement. However, the policies of Key Risk require that the medical provider be paid directly and Key Risk is unable to continue the Department's procedure of direct reimbursement to plaintiff. Defendant is responsible for keeping track of payments to Dr. Lieberman and for providing the medical provider with a 1099 at year-end for tax purposes. Paying the doctor directly also enables defendant to reduce the risk of fraud, embezzlement, and provides accuracy as to treatment provided cases, including plaintiff's case.
30. Defendant's Exhibit Number 2 shows the date checks were paid along with some handwritten notations that Ms. Vogler of Key Risk wrote to show when the request for reimbursement was received. However, there is no date to indicate when the checks were mailed. Testimony from plaintiff, as well as plaintiff's Exhibit Number 2, show at least one instance where a check from Key Risk was dated July 26, 2000 and the envelope plaintiff received was postmarked September 6, 2000. Plaintiff testified that he has little success trying to communicate with Key Risk to make sure they have received the requisite information for reimbursement purposes.
31. Defendant introduced no evidence that Dr. Lieberman's charges were excessive or improper under the North Carolina Industrial Commission fee schedule. There is no evidence that the cost of medical care would be reduced if a North Carolina physician treated plaintiff.
32. The physician selected by defendant for an independent medical examination, Dr. Darcy, had no suggestions of physicians who could or would treat plaintiff. Defendant has presented no evidence as to what alternative treatment plan is recommended for plaintiff.
33. The evidence of record also shows that defendant Key Risk has failed to make timely payment of disability benefits to plaintiff. In particular, in November and December 2000 Key Risk fell behind in paying disability benefits and also mailed the checks to the wrong street number in the address.
34. Plaintiff continues to require medical care and monitoring of his condition.
35. Plaintiff, in an effort to return to work, sold the home that provided him with safe housing for his condition. Plaintiff required the assistance of housing experts to evaluate the purchase of a safe house and incurred costs in obtaining such assistance.
36. The Full Commission finds based upon the evidence of record, plaintiff requires the assistance of his wife to attend doctor's appointments and to travel to South Carolina to see Dr. Lieberman. In that the one-way trip to Dr. Lieberman's office takes approximately 4 ½ hours, it is reasonable for defendant to provide overnight accommodations to plaintiff and his wife.
37. This matter was appealed to the Full Commission by defendant from an Opinion and Award awarding benefits and results in the affirmation of that award.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. No party to any agreement for compensation approved by the Industrial Commission shall thereafter be heard to deny the truth of the matters therein set forth, unless it shall be made to appear to the satisfaction of the Commission there has been error due to fraud, misrepresentation, undue influence or mutual mistake. N.C. Gen. Stat. §97-17. No evidence of fraud, misrepresentation or mutual mistake was shown by defendant to overcome the prior Awards of the Commission by the Industrial Commission Form 21 and Form 26. New information, which defendant claims tends to refute plaintiff's injury, is not sufficient to revoke a prior Award of the Commission. Glenn v. McDonald's,109 N.C. App. 45, 425 S.E.2d 727 (1993). Plaintiff sustained a compensable injury of toxic exposure arising out of and in the course of his employment with defendant.
2. Dr. Lieberman was approved by defendant as plaintiff's authorized treating physician for over eight years of care. The Industrial Commission authorized Dr. Lieberman as plaintiff's treating physician in April 2000 and this authorization remains in effect. N.C. Gen. Stat. §97-25. His treatment was and is required to provide relief and effect a cure for plaintiff's condition. N.C. Gen. Stat. § 97-2(19).
3. Plaintiff is entitled to payment by defendant of medical treatment related to his compensable injury. This medical care includes additional neuropsychological treatment for depression and sleep problems, as recommended by Dr. Logue.
4. Plaintiff is currently totally disabled. Under the Industrial Commission fee schedule, reimbursement for travel and meals is permitted for totally disabled plaintiffs who require assistance. Plaintiff's authorized treating physician supports his need for assistance. Payments can be ordered for family members who provide assistant care to an injured employee. Levens v. Guilford County Schools, 152 N.C. App. 390,567 S.E.2d 767 (2002).
5. Defendant failed to timely and completely reimburse plaintiff for past travel expenses in violation of N.C. Gen. Stat. § 97-18(i). Plaintiff is entitled to a 10% penalty on any reimbursement requests for travel expenses that were not paid within 60 days after being submitted to defendant for payment. Dr. Lieberman is entitled to a 10% penalty for any reimbursements not paid within 60 days after defendant received the reimbursement request. Defendant shall only be responsible for making the payment to Dr. Leiberman within 60 days of receipt of the request for reimbursement and shall not be held responsible for any time delay caused by Dr. Lieberman's office forwarding the reimbursement to plaintiff.
6. Plaintiff is entitled to a 10% penalty to be paid by defendant for any total disability benefits that were paid more than 14 days after they became due, including November and December 2000 benefit payments. N.C. Gen. Stat. § 97-18(g).
7. Plaintiff requires special housing considerations due to his condition. Plaintiff is entitled to payment by defendant for the assistance of housing experts in identifying and modifying homes for a safe housing environment. The cost of modifying housing to accommodate one with extraordinary needs occasioned by a workplace injury is considered "other treatment" under N.C. Gen. Stat. § 97-25; Timmons v.N.C. Dept. of Transportation., 123 N.C. App. 456, 473 S.E.2d 356 (1996).
8. Plaintiff is entitled to an attorney's fee assessed against defendant in the amount of $1,000.00 pursuant to N.C. Gen. Stat. § 97-88.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Dr. Lieberman shall remain plaintiff's authorized treating physician.
2. Defendant shall pay a 10% penalty on any reimbursement to Dr. Lieberman for medical treatment that was not paid within 60 days of receipt of the request for reimbursement.
3. Dr. Lieberman shall submit bills directly to defendant for plaintiff's medical care. The carrier may require a copy of the physician's notes and the forms required under the Industrial Commission for itemization of medical expenses from Dr. Lieberman's office before making payment.
4. Defendant shall pay a 10% penalty on any total disability benefits that were paid more than 14 days after they became due, including November and December 2000 benefits.
5. Defendant shall reimburse both plaintiff and his wife's motel, food, and parking expenses incurred for plaintiff's medical treatment, including a 10% penalty on any past reimbursement requests which were paid more than 60 days after plaintiff submitted them to defendant for payment. The approved expenses include overnight accommodations for plaintiff and his wife for travel to Charleston, South Carolina.
6. Defendant shall make payment to plaintiff for reimbursement for housing evaluation expenses related to the purchase of his current home upon receipt of those invoices from plaintiff.
7. Defendant shall provide reimbursement for reasonable and necessary housing expenses for plaintiff related to the purchase of his current home. Such expenses include carpet removal, new flooring, home renovations or other costs associated with the modification of plaintiff's home.
8. As recommended by Dr. Logue, plaintiff shall submit to treatment by a neuropsychologist for depression and sleep problems. In the event that the parties are unable to agree on a neuropsychologist, the Commission shall refer the matter to the Industrial Commission nurse's section for assistance and recommendations concerning selection of a neuropsychologist.
9. Defendant shall pay the costs, including a reasonable attorney's fee in the amount of $1,000.00 to plaintiff's attorney.
This the 6th day of April 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/kjd